**Maudine BENTON, Plaintiff,**

v.

**COUSINS PROPERTIES, INC., Marriott, Inc., Jeff McCarthy, Linda Beauchamp, and Tracy Baker, Defendants.**

**No. CIV.A.1:00–CV–2903–J.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 27, 2002.

Jamie Gail Miller, Whatley Stephenson & Voyles, Atlanta, GA, for Plaintiff.

Stephen W. Riddell and Jennifer R. Williams, Troutman Sanders, R. Peter Catlin, III, Coleman & Dempsey, Atlanta, GA, for Defendants.

## ORDER

CARNES, District Judge.

The above-captioned action is before the Court on plaintiff's Motion to Compel [31]; defendants' Motion to Exclude Testimony [47]; defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [57] and Motion to File a Memorandum of Excess Pages [54]; defendants Sodexho, Inc.'s [1] and Tracy Baker's Motion for Summary Judgment [56] and Motion to File Memorandum of Excess Pages [55]; plaintiff's Motion to File a Response Brief Ex-

---

1. Sodexho Inc. ("Sodexho"), formerly known as Sodexho Marriott Services, Inc., states that it is the correct defendant and that plaintiff has incorrectly named "Marriott, Inc." as a defendant in the Complaint. Although Sodexho informed the plaintiff in its Answer, filed January 11, 2001, that "Marriott, Inc." had been improperly named as a defendant, the plaintiff has not moved to amend the Complaint to substitute the proper name of Sodexho. Thus, although the caption of this action reflects that "Marriott, Inc." is a defendant, the parties use the names "Sodexho" and "Marriott" interchangeably to refer to defendant Sodexho. (*See, e.g.,* Cousins SMF at ¶ 8 ["The Plaza conference facilities are operated by Marriott."] and Marriott SMF at ¶ 6 ["On or about November 3, 1998, Ms. Benton contacted Sodexho, and inquired about renting conference space at NationsBank Plaza for a holiday Bazaar."].) To avoid confusion, the Court will generally use the word "Marriott" to denote this defendant, as that was the name by which the defendant was familiarly known at the time of the events in this litigation.

ceeding the Page Limitation [68]; plaintiff's Motion to Supplement her Responses to defendants' Motions for Summary Judgment [71]; plaintiff's Motion to Supplement her Response to defendants' Statements of Material Facts [75]; defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's (Second) Motion to Exceed the Page Limits [80]; plaintiff's Motion for Leave to File a Sur–Reply to defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [84]; plaintiff's Motion for Leave to File a Sur–Reply to defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [87]; and plaintiff's Motion for Leave to Supplement her Sur–Reply to all defendants' Motions for Summary Judgment [88].

The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that plaintiff's Motion to Compel [31] should be **DENIED as MOOT**; defendants' Motion to Exclude Testimony [47] should be **DENIED as MOOT**; defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [57] should be **GRANTED**; defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [56] should be **GRANTED**; plaintiff's Motion to Supplement her Responses to defendants' Motions for Summary Judgment [71] should be **GRANTED**; plaintiff's Motion to Supplement her Response to defendants' Statements of Material Facts [75] should be **GRANTED**; plaintiff's Motion for Leave to File a Sur–Reply to defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Mo-

tion for Summary Judgment [84] should be **DENIED**; plaintiff's Motion for Leave to File a Sur–Reply to defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [87] should be **DENIED**; and plaintiff's Motion for Leave to Supplement her Sur–Reply to all defendants' Motions for Summary Judgment [88] should be **DENIED**. All motions filed by the parties requesting leave from the Court to file briefs exceeding the page limitations of the Local Rules [54][55][68][80] are **GRANTED**.

## FACTS

This is an action for race discrimination in the formation and performance of contracts, pursuant to 42 U.S.C. §§ 1981, 1985, 1986, and 2000a, and related causes of action under Georgia state law. Plaintiff Maudine Benton filed the Complaint [1] in this action on November 2, 2000, alleging that defendants failed to honor their contracts with her in the same manner that they honored similar contracts with Caucasians and other non-African-Americans.[2] The plaintiff rented a conference room with defendants in order to hold a holiday craft show (the "show" or "bazaar") on December 17, 1998. She alleges that, although the defendants allowed the craft show to take place on that day, they unreasonably interfered with the show and they failed to provide all the normal services that they typically provided to white persons who also booked events at defendants' conference facilities.

Unless otherwise indicated, the Court draws the undisputed facts from the defendants' statements of fact filed in connec-

---

**2.** When used in this Order, the term "African–American" does not reference a "national origin" classification, which could include members of the white or black race. Instead, when the term is used by the parties or the Court it refers to individuals whose racial group is black. Accordingly, the terms "African–American" and "black" are used interchangeably. Likewise, the terms "Caucasian" and "white" are used interchangeably to refer to individuals whose racial group is white.

tion with their respective motions for summary judgment. If, however, plaintiff has disputed any of those facts and pointed to evidence in the record that supports its version of events, the Court has viewed all evidence and factual inferences in the light most favorable to plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Because, at times, the plaintiff has pointed to different facts than those noted by the defendants, the Court has also relied on the plaintiff's separate Statement of Facts [66][3] in discussing the relevant facts set out below.

Defendant Cousins Properties, Inc. ("Cousins") is the property management firm for an office building located at 600 Peachtree Street in Atlanta, Georgia. (Cousins Defendants' Statement of Facts [Cousins SMF] [57] at ¶ 1.) Although this office building is currently known as the "Bank of America Plaza," the building was known as the "NationsBank Plaza" during the relevant time period in 1998 and 1999. Thus, for purposes of this discussion, the Court will refer to this building as the "Plaza." (*See* Pl. Resp. to Cousins SMF [66] at ¶ 1.) Defendant Linda Beauchamp is the Senior Property Manager at the Plaza and Defendant Jeff McCarthy, the Assistant Property Manager, reports to Beauchamp. (Cousins SMF at ¶ 1.) For the purposes of this discussion, the Court will refer to Cousins, Beauchamp, and McCarthy collectively as the "Cousins Defendants."

Defendant Sodexho, Inc. ("Marriott" or "Sodexho"), formerly known as Sodexho Marriott Services, Inc., is responsible for managing the cafeteria and conference facilities at the Plaza, along with other services such as vending services, office copy services, and executive dining services. (Marriott Defendants' Statement of Material Facts [Marriott SMF] [67] at ¶ 1.) During 1998, Rick Dunham was the general manager of Marriott's operations at the Plaza. (Marriott SMF at ¶ 3.) During the relevant time period, Crystal Brown was a Marriott employee who worked as a sales coordinator booking events for the conference facilities at the Plaza. (*Id.* at ¶ 4.) Also during the relevant time period, defendant Tracy Baker was an employee of Marriott at the Plaza and, after August, 1998, she was responsible for overseeing the operations of the conference center. (*Id.* at ¶ 2.) Marriott alleges that Baker's title was "Assistant Manager," while plaintiff asserts that her proper title was "Catering Manager." (*See* Pl. Resp. to Marriott SMF at ¶ 2.) Although the parties dispute Baker's official title, they agree that she was the person primarily responsible for booking events at the conference facilities at the Plaza during the relevant time period.

In the lobby of the Plaza there is a shoeshine stand called "Plaza Executive Shine" that is provided as an amenity for the building's tenants and the general public. (Cousins SMF at ¶ 2; Plaintiff's Statement of Facts ["Pl. SMF"] [66] at ¶ 3.) From 1996 to 1999, Cousins had an agree-

---

**3.** Defendants have objected to plaintiff's Statement of Facts on the grounds that the Local Rules do not permit a non-movant to file a separate Statement of Facts, but the Court notes that the Local Rules not only permit such a statement to be filed by a respondent, they *require* it. *See* LR 56.1B, NDGa ("The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried.").

ment with Arthur "Doc" Arnold to operate the shoeshine stand. (Cousins SMF at ¶ 2.) Arnold was neither a tenant nor an employee of Cousins. (*Id.*) Plaintiff refers to this agreement between Arnold and Cousins as a "contract," although it appears from the evidence presented by the parties that there was never a written contract that was formally executed. (*See* Cousins SMF at ¶¶ 2–3; Pl. Resp. to Cousins SMF at ¶¶ 2–3; Marriott SMF at ¶ 5.) McCarthy did send a letter to Arnold dated January 12, 1998, however, in which he outlined the general terms of the agreement between Cousins and Arnold over the operation of Plaza Executive Shine. (Arnold Dep., Ex. 1.) In any event, the parties do not dispute that Cousins had an agreement with Arnold to operate the shoeshine stand and, under this agreement, neither party paid the other, but instead Arnold was entitled to the proceeds generated from the shoeshine stand. (Pl. Resp. to Cousins SMF at ¶ 2.)

Pursuant to the agreement between Cousins and Arnold, Arnold was to select a "qualified operator" to conduct the daily operations of the Plaza's shoeshine stand. (Cousins SMF at ¶ 3; Arnold Dep., Ex. 1.) The only requirements that the operator was required to follow were that the stand would be open Monday through Friday from 8:00 a.m. to 5:00 p.m. and that the operator was to wear "professional black and white attire." (*Id.*) Cousins contends that the agreement further provided that the person chosen by Arnold to operate the shoeshine stand, as well as any "substitute" for that person, had to be approved by Cousins' management. (*Id.*) Plaintiff, on the other hand, contends that the approval of Cousins' management was required only for someone who would substitute for the operator when the operator was not present, and was not required for an "assistant." (Pl Resp. to Cousins SMF at ¶ 3.)

In November, 1997, Arnold selected plaintiff Maudine Benton, an African–American female, to operate the shoeshine stand in the lobby of the Plaza. (Cousins SMF at ¶ 4; Marriott SMF at ¶ 5; Pl. SMF at ¶ 1.) Plaintiff thereafter operated the Plaza shoeshine stand until February, 1999. (Marriott SMF at ¶ 5.) Although the parties characterize the relationship between plaintiff and Cousins differently, the following facts are undisputed: Cousins had a direct arrangement with Arnold to run the shoeshine stand and Arnold was responsible for selecting the operator of the stand, subject to approval by Cousins; Arnold selected the plaintiff to operate the stand from November, 1997 through February, 1999, and Cousins approved plaintiff as the operator throughout that time; plaintiff paid Arnold a weekly fee or "rent" of $100 to $125 to run the shoeshine stand; no money was exchanged between Cousins and the plaintiff over the operation of the shoeshine stand; and Cousins terminated the arrangement with Arnold, and therefore the plaintiff, in February, 1999. (Cousins SMF at ¶¶ 3–5, 26–27.) During the entire time plaintiff operated the shoeshine stand, she admits she never heard any racially discriminatory comments from defendants McCarthy, Beauchamp or any other person affiliated with Cousins. (Pl. Dep. at 391–92.)

In November, 1998, while operating the Plaza Executive shoeshine stand, plaintiff came up with an idea to host a multi-vendor "holiday bazaar" in which the vendors would display their arts and crafts merchandise for sale to the public. (*See* Pl. SMF at ¶¶ 17–18.) She planned to conduct the holiday Bazaar with the cooperation and assistance of Shelia Mants and Melanie Wofford, both of whom are also African–American. (Cousins SMF at ¶ 7; Marriott SMF at ¶ 7.) The plaintiff was to secure the location for the event, Mants was to plan the event and obtain vendors,

and Wofford had an administrative role. (Marriott SMF at ¶ 7.)

On November 3, 1998, plaintiff telephoned Marriott about reserving a conference room at the Plaza for December 17, 1998. (Marriott SMF at ¶ 6; Pl. SMF at ¶ 19; Benton Dep. at 32.) As noted, the Plaza conference facilities are operated by Marriott Sodexho. (Cousins SMF ¶ 8.) In her deposition testimony, plaintiff states that she told Baker that, "me and two young ladies wanted to hold a show... [a]nd I asked if we could get [a conference room] at the tenant's rate." (Pl.'s Dep. at 32.)[4] At that time, plaintiff indicated that only twenty people would attend the show. Plaintiff further states that Baker said she didn't "have to go through Cousins in order to be able to have the show... but [that she did] need to contact Cousins in terms of the signs" because Cousins is "responsible for the signs." (Pl. Dep. at 32; SMF at ¶ 19.) On that same day, Marriott faxed an invoice to plaintiff, confirming that she had reserved one room for a show to be held on Thursday, December 17, 1998, from 6:30 a.m. to 5:00 p.m. and that twenty people would attend. (*See* Pl.Ex. 5; Marriott SMF at ¶¶ 9, 10.) The initial rent for the one conference room reflected on the invoice was $321.00, which, according to Marriott, was the same rental rate available to "any other tenant for NationsBank Plaza." (Marriott SMF at ¶ 11.)

Marriott's policy is to explain any special requirements and associated costs to its customers at the time the conference space is booked. (Pl. SMF at ¶ 26; Brown Dep. at 68–69; Dunham Dep. at 33–34; Baker

Dep. at 296.) When plaintiff booked the room over the telephone, she asserts that she was not informed by anyone at Marriott that there would be any additional charges for services auxiliary to the use of the room. (Brown Dep. at 20–21.) She also did not inquire whether she would be responsible for the expense of additional services beyond that of the room rental fee.[5] Incidently, at that time, Marriott believed that only twenty people would attend the event scheduled to take place in one conference room.

At some point after booking the Plaza conference room in November, 1998, plaintiff, Mants, and Wofford circulated a flyer to promote the event and to solicit the participation of vendors at the show. (Cousins SMF at ¶ 10; Marriott SMF at ¶ 20; *see* Pl.Ex. 6.) The flyer stated at the top: "Vendors Wanted," under which it stated "Holiday Bazaar," and under that it stated "NationsBank Plaza," followed by "Thursday, December 17, 8:30–5:30." (Pl. Ex. 6.) The flyer also stated that Nations-Bank Plaza was the home to fifteen companies, with a combined total of over 8,000 employees, and that the holiday bazaar presented a "unique opportunity to reach 1000's of people during the busiest time of the year." (*Id.*) Furthermore, the flyer indicated that the rental fee for a vendor wishing to participate would be $100.00 and that this fee would provide the vendor with a table, two chairs, a table cloth, and skirt. (*Id.*) The flyer also contained an application form for any vendor wishing to participate. (*Id.*) Finally, the flyer stated that completed application forms could be

---

4. Earlier on November 3, 1998, plaintiff had previously spoken with Crystal Brown about the event, and plaintiff asserts that she informed Brown that the event would include multiple vendors who would be selling arts and crafts. (Pl. SMF at ¶ 18.) Brown states that she told Baker about her conversation with plaintiff. (Brown Dep. at 20.)

5. In determining whether special services or charges were required, Marriott referred to guidelines established by Cousins that applied to all events booked at the Plaza conference facilities, regardless of the type of event. (Pl. SMF at ¶ 26; Brown Dep. at 43–44.)

submitted in person at Executive Shine, located in the lower level, West Wing Plaza NationsBank. (*Id.*) Beyond indicating that the completed forms were to be returned to the shoeshine stand, there was no mention of any entity—other than NationsBank—in the body of the flyer so as to make clear that, in fact, an entity other than NationsBank was actually the host of the show. Neither plaintiff, Mants nor Wofford sought the approval of anyone affiliated with Cousins or Sodhexo prior to the distribution of the flyer. (Benton Dep. at 186, 189.)

On or about November 22, 1998, Beauchamp and McCarthy recalled first learning of plaintiff's plan for a multi-vendor holiday bazaar when a flyer soliciting vendors to participate in the event was delivered to the Cousins management office. (Marriot SMF ¶ 20; Beauchamp Dep. at 183; McCarthy Dep. at 175.) Plaintiff disputes that contention, claiming that both Beauchamp and McCarthy knew about the holiday bazaar earlier, because plaintiff and Wofford had left messages at the Cousins office regarding signage for the event. (Pl. Resp. to Marriott SMF at ¶ 20.) Regardless of the actual date that the Cousins defendants became aware of the bazaar, there is no dispute that, after McCarthy and Beauchamp saw the flyer, they were concerned. Specifically, defendants believe that the flyer "gave the false impression that Cousins and/or NationsBank was hosting the Bazaar" and grossly misrepresented the number of employees and visitors to the Plaza. (Cousins SMF at ¶¶ 10, 11; Pl. Resp. to Cousins SMF at ¶¶ 10, 11.)[6] In fact; plaintiff admits that she did not obtain any tenant or traffic information from Cousins about the plaza,

but rather speculated about the tenants and the building to create the flyer. (Benton Dep. at 304, 306; Mants Dep. at 93–94.) Beauchamp and McCarthy, as agents of Cousins, arranged to meet with plaintiff and Doc Arnold on December 11, 1998 to discuss their concerns about the flyer and the event with plaintiff. (Marriot SMF ¶ 22.)

The defendants' concerns about plaintiff's holiday bazaar were based largely on the fact that it was a very unusual event to have been booked for the conference facilities at the Plaza. (Marriott SMF at ¶ 13; Cousins SMF at ¶ 8.) The conference rooms were typically used for business meetings, not merchandise sales events, and particularly not a sales event that included multiple unrelated vendors, such as plaintiff's bazaar. (Cousins SMF at ¶ 8; Marriott SMF at ¶ 13.) Marriott states that it has not booked or scheduled an event similar to the bazaar, involving numerous vendors, either before or since plaintiff's event. (Marriott SMF at ¶ 14.) Cousins states that it has occasionally sponsored merchandise sales events, such as a "Dress Code" trunk show and a Monet jewelry show, but that these events have always been single-vendor shows. (Cousins SMF at ¶ 21; Beauchamp Dep. at 264.) Furthermore, Cousins contends that these merchandise sales shows are usually not held in the conference facilities, but are held outside the cafeteria or in the gallery area. (Cousins SMF at ¶ 21; Beauchamp Dep. at 266–268.) Furthermore, when it sponsors a sales merchandise event, Cousins requires the vendor to donate ten percent of the event's revenue to charity, on behalf of Cousins, and, in

---

**6.** After Jeff McCarthy of Cousins saw the flyer, he told Doc Arnold that he believed that plaintiff had "fraudulently" used Cousins Properties to imply sponsorship of the Bazaar, "but that as far as they were concerned, it was not going to happen." (Arnold Dep. at 51, 53.) According to Arnold, McCarthy had a "big, big big problem" with the flyer, and, on two or three occasions, McCarthy told Arnold that the Bazaar "was not going to happen." (Arnold Dep. at 52.)

consideration for such, Cousins provides the space, as well as security and janitorial services, to the vendor. (Cousins SMF at ¶ 21; Beauchamp Dep. at 190.)

Plaintiff, however, asserts that the conference facilities at the Plaza are used for "a wide range of events such as jewelry shows, book shows, clothing shows, cocktail parties, and receptions." (Pl. Resp. to Cousins SMF at ¶ 8.) She further contends that Marriott has had other events with multiple vendors in their facilities, including the "Dress Code and Monet Jewelry Show" in which she asserts that two nonrelated vendors shared space together. (Pl. Resp. to Marriott SMF at ¶ 13.) In support of her contention, she has produced a flyer advertising a one-vendor "Dress Code Trunk Show" to be held on July 29 and 30, in an unspecified year. (Pl.Ex. 34.) Yet, notwithstanding her contention, plaintiff has failed to produce any evidence that Marriott has ever booked any event with multiple vendors, other than the plaintiff's bazaar.[7] Moreover, at the time plaintiff's event was booked, although there was no official policy prohibiting multi-vendor events at the Plaza, plaintiff does not dispute that, since the bazaar, Marriott has not booked vendor events of *any* kind because Marriott now prohibits such events from being held in the Plaza conference facilities. (Pl. Resp. to Cousins SMF at ¶ 8; *see* Dunham Dep. at 67; Brown Dep. at 13.; Pl. Resp. to Marriott SMF at ¶ 14.)

Nevertheless, allegedly based on positive responses to the flyer and the number of vendor applications that plaintiff received, plaintiff was permitted to book additional space for the show on December 1, 1998. (Pl. SMF at ¶ 36; Pl.Ex. 8.) Plaintiff has produced an invoice from Marriott Catering Services, dated December 1, 1998, which reflects that the rental rate for two conference rooms reserved for the show on December 17 was increased to $642.00. (Pl.Ex. 8.) Again, the invoice reflects that the total number of people attending the event was to be "20," which was the same number of attendees listed on the original invoice for one conference room. (*Id.*) Plaintiff nevertheless contends that she informed Marriott at that time that the number of attendees would be approximately forty-five (45). (Pl. Resp. to Cousins SMF at ¶ 16.) She further contends that, when she booked the "additional space," nobody from Marriott informed her that the there would be additional charges or requirements for services auxiliary to the room rental rate. (Pl. SMF at ¶ 36.) Again, however, plaintiff does not dispute the fact that she failed to ask about any additional fees for services over and above the cost of room rental.

After Beauchamp and McCarthy saw the flyer, they met with Baker on one or two occasions in early December to discuss concerns they had about the holiday bazaar. (Baker Dep. at 104–106; Pl. SMF at ¶ 37.) According to Baker, Beauchamp and McCarthy "wanted to know what was going on with it, was it progressing," and she told them that it was progressing and she had "a signed contract" with the plaintiff for the conference rooms for the event. (Baker Dep. at 106.) Beauchamp and McCarthy also told Baker that, because of the potential "traffic flow" for the event, it would be necessary to provide additional janitorial and security services. (Baker

---

**7.** The plaintiff has also produced copies of an invoice reflecting payment for facilities rented for a "Dress Code" show to be held on May 12, 1999, and a jewelry show to be held on June 29–30, 1999. (Pl.Ex. 35 and 36.) She does not explain how this invoice reflects that Marriott booked an event involving two "nonrelated" vendors, because the invoice does not reflect the number of vendors participating in either the Dress Code show or the jewelry show, or the identities of these vendors.

Dep. at 108.) Beauchamp and McCarthy instructed Baker to inform the plaintiff of the additional requirements for janitorial and security services. (Baker Dep. at 111.) Beauchamp and McCarthy explained that Cousins required extra security for the bazaar because the participants for the event were not tenants of the building and would include "a crowd that we didn't know and couldn't control." (Baker Dep. at 306–307.) Upon learning of the services required for the event, Dunham, who was the general manager of Sodexho Marriott's operations at the plaza at the time, instructed Baker to bill the plaintiff directly for all charges for the additional services being required by Cousins for the bazaar. (Marriott SMF at ¶ 30.) [8]

On or around December 2, after this discussion with Beauchamp and McCarthy, Baker called plaintiff to discuss the event (Benton Dep. at 103–104.) Baker explained to plaintiff that the conference rooms were not available for "resale." (Id. at 103.) Since plaintiff's intention was essentially to "resell" or sublease space in the room to bazaar participants, Baker informed plaintiff that she was unable to have the event if she "resold" the conference center space to vendors. (Id.) [9] Baker then asked plaintiff if, "given that I've told you it's not for resale, are you going to continue to have this show?" (Benton Dep. at 104.) Plaintiff asserts she responded that she did indeed intend to proceed with the event as planned on December 17, 1998. (Id.; Pl. SMF at ¶ 38.) Plaintiff then told Baker that she needed to discuss the matter further with Mants and ended the phone call. (Benton Dep. at 104.) About fifteen to twenty minutes later, Mants called plaintiff after receiving a telephone call from Baker. Mants asked plaintiff if she had the right to "put on a show" at the Plaza since Baker had told

8. According to Dunham, decisions to provide security or janitorial services were generally made on a case-by-case basis, depending upon the needs of the specific customer and event and the general Cousins guidelines. (Dunham Dep. at 30–31; Marriott SMF at ¶ 3.) If additional services were required for an event, Marriott typically passed the extra charges for additional services on to the customers. (Dunham Dep. at 30–31.) For example, generally security officers were required for any event of thirty or more people and janitorial services could be required on a per event basis. Further, parking in the Plaza's garage is not available for large events. (Baker Dep. Ex. 16.) In Baker's experience, extra janitorial and security services were ordinarily required for events held on the 53rd floor or for night events that involved larger number of people. (Baker Dep. at 110–111.) In addition, large meetings held in the auditorium sometimes required additional staff. (Id. at 111.) These extra services, and the charges for those services, were typically reflected on the initial contract submitted to the customer. (Id.) In the case at hand, however, Marriot was told first that only twenty people would attend the show, and, later, that only forty-five would attend the show, as evidenced by both invoices. (Pl.Ex. 5; Pl.Ex. 8.) Presumably, for that reason, they did not envision a need for expanded janitorial or security services, nor did they discuss same with plaintiff initially.

9. The standard license agreement to be executed between Cousins and its licensors states "[l]icensee may not assign, transfer, sell, mortgage, encumber or otherwise convey (whether voluntarily, involuntarily or by operation of law) this License (or any interest therein) nor license, mortgage, encumber or otherwise grant to any other person or entity (whether voluntarily, involuntarily, or by operation of law) any right or privilege in or to the License Area (or any interest therein) in whole or part." Since Marriot, and not Cousins, was responsible for the conference rooms, the standard license agreement was not executed between plaintiff and Cousins for use of the rooms. In determining whether special services or charges were required, however, Marriott referred to guidelines established by Cousins that applied to all events booked at the Plaza conference facilities, regardless of the type of event. (Pl. SMF at ¶ 26; Brown Dep. at 43–44.)

her that plaintiff was not formally a "tenant." (Benton Dep. at 105.) [10]

On December 10, McCarthy had a telephone conversation with Mants in which he explained the building requirements for the Bazaar. Based on the expected number of attendees, as well as the multi-vendor nature of the bazaar, and consistent with Cousins' procedures for events, McCarthy explained to Mants the following matters: the inability to use the "drop mail," because the event was not a Cousins-sponsored event, the need to procure insurance, and the need for additional security. (Mants Dep. at 80–81, 85–86, 88.) McCarthy then told Mants that Executive Shine was not an "entity" and that plaintiff "was not entitled to the same privileges as other companies in the building." (Mants Dep. at 83–84.) In addition, McCarthy informed Mants that if the elevators were to be used during the event, padding and security guards would have to be paid for in order to ensure the elevators were not damaged. Finally, they discussed that, in the alternative, the loading dock and a flight of stairs could be used during the event. (*Id.*)

The next day, December 11, plaintiff attended the previously scheduled meeting with Beauchamp, McCarthy and Doc Arnold in a Cousins conference room in the Plaza. (Cousins SMF at ¶¶ 13, 16; Marriott SMF at ¶ 22; Arnold Dep. at 53–54.) During this meeting, Cousins asserts that it learned more about the planned bazaar from plaintiff. When Arnold realized that Beauchamp and McCarthy did not want to discuss issues involving the shoeshine stand, and intended to discuss the flyer

and various concerns that they had about the bazaar, he left the meeting because he was not involved with that event. (Arnold Dep. at 54.)

After Arnold left the meeting, McCarthy and Beauchamp discussed their concerns about the flyer and the bazaar with the plaintiff. (Cousins SMF at ¶¶ 16–17.) Plaintiff was explicitly told about the building requirements for the bazaar, including janitorial and security requirements, the need for a certificate of insurance, and the admonition that no flyers were to be distributed internally. (Beauchamp Dep. at 226–27, 231, 233–35.) With regard to signage, plaintiff was also informed that she had to obtain Cousins' approval for any advertisement signs. (*Id.* at 245, McCarthy Dep. at 213.) Beauchamp or McCarthy informed plaintiff that Cousins would provide the extra janitorial and security services during the event, and Cousins would bill Marriott for the charges. (Beauchamp Dep. at 257–259.) After the meeting, the plaintiff sent a letter to Beauchamp that reflected her understanding that Cousins would provide the extra janitorial and security services, as well as providing standard black lacquered signs for the event. (Pl.Ex. 11.) Although Beauchamp received this letter, she never responded to it. (Beauchamp Dep. at 258–259.)

After Beauchamp and McCarthy met with plaintiff on December 11, 1998, either later that day or the next day, McCarthy contacted Arnold by telephone and asked Arnold about "what kind of notes" the plaintiff had been taking, but Arnold re-

---

**10.** Interestingly, Mants testified in her deposition that she would not work with plaintiff Benton again on another project because "she just seemed to have fallen apart throughout the pressure and everything from the bazaar … [a]nd just emotionally, she was just out there." (Mants Dep. at 157.) Mants also stated that, although Marriott representative

Baker was "stressed out" about the event and needed to be reassured that the event was not going to be a "big flop," (*id.* at 175), Baker was still being "responsive" to her in attempting to help her with the show, even if she was not "cooperative" with the event planners, in that she was trying to secure plaintiff's signature on a new contract. (*Id.* at 181.)

sponded that it was not his business, since he had no involvement with the planning for the holiday bazaar. (Arnold Dep. at 54.) McCarthy also told Arnold that the plaintiff was being "stubborn about this [the holiday bazaar]. She's not going to have that. We're not going to let her do that." (Arnold Dep. at 54.)

On Monday, December 14, 1998, Baker telephoned plaintiff at the shoeshine stand and asked the plaintiff to come to Baker's office to sign a new contract reflecting the additional requirements and service charges for the bazaar that had been discussed during the meeting held the previous Friday. (Pl. SMF at ¶ 60; Benton Dep. at 85.) When the plaintiff arrived at Baker's office, she was presented with an invoice reflecting total charges of $1,904.60, including a room rental rate of $642.00, plus additional charges for Janitorial and Security Personnel, and Traffic Control. (Pl.Ex. 12.) Plaintiff refused to sign this contract. (Marriott SMF at ¶ 32; Pl. SMF at ¶ 60; Benton Dep. at 85–86.) Baker "repeatedly" requested that plaintiff sign the new contract, but plaintiff refused. (Marriott SMF at ¶ 31; Pl. SMF at ¶ 61.) Later that day, Baker called the plaintiff approximately five or six times, demanding that she sign the contract, but plaintiff continued to refuse. (Benton Dep. at 87–88; see Baker Dep. at 130.) After plaintiff persisted in not agreeing to pay the additional charges, Baker informed the plaintiff that she had twenty-four hours to cancel the show because there were other parties who wanted to rent the room. (Pl. SMF at ¶ 61; Baker Dep. at 125.)

The next day, December 15, 1998, McCarthy approached plaintiff at the shoeshine stand and told her that he needed her to provide a Certificate of Insurance before he could make the schedule of events for the building. (Pl. SMF at ¶ 62; Benton Dep. at 89–90.) The plaintiff purchased the Certificate of Insurance at a cost of $468.00, and brought it to the Cousins office on the morning of December 16, 1998, the day before the bazaar was to take place. (Pl. SMF at ¶ 63; Benton Dep. at 69; Pl.Ex. 23–25.) Later that same day, Baker and McCarthy approached the plaintiff at the shoeshine stand with a new invoice reflecting total charges of $1,298.62. (Cousins SMF at ¶ 18; Pl. SMF at ¶ 64; Pl.Ex. 16.) Although the parties dispute the specific words used, the evidence reflects that the conversation became heated and plaintiff's assistant at the shoeshine stand, James Crayton, asked Baker and McCarthy to keep their voices down because they were disturbing the patrons at the shoeshine stand. (Pl. SMF at ¶ 64; Benton Dep. at 369; Baker Dep. at 209.)

Baker and McCarthy again asked plaintiff to sign the new contract, but again she refused, stating that she intended to stick with the original contract. (Cousins SMF at ¶ 19; Pl. SMF at ¶ 65.) Baker had brought plaintiff's check with her, and she then left the check (according to defendants) or threw the check (according to plaintiff) on plaintiff's desk, telling the plaintiff she needed to take her check back because the show was not going to happen. (Cousins SMF at ¶ 19; Pl. SMF at ¶ 71–72.) Baker then stated that plaintiff had accepted the check, and that McCarthy was her witness that the plaintiff had accepted the check. (Pl. SMF at ¶ 66; Benton Dep. at 79; see Baker Dep. at 135.) The plaintiff then responded that she was not accepting the check, and that Crayton was her witness that she had not actually accepted the check. (Pl. SMF at ¶ 66; Benton Dep. at 91; Baker Dep. at 209–210.)

Shortly after Baker and McCarthy left the shoeshine stand, plaintiff received a call from Doc Arnold informing her that McCarthy had just called him and wanted Crayton removed from the building. (Pl.

SMF at ¶ 67; Benton Dep. at 93–94.) Crayton did not leave the building, and security never arrived to remove him. (Pl. SMF at ¶ 67.)

Later that same day, December 16, 1998, Baker and McCarthy came back to see the plaintiff at the shoeshine stand. (Pl. SMF at ¶ 68; Benton Dep. at 98.) This time, Baker brought with her a letter addressed to the plaintiff explaining that, because the plaintiff had refused to pay for the additional janitorial and security services that the building required, the holiday bazaar would be limited in attendance to forty-five people and that, once forty-five people had entered the reserved conference rooms, "further admittance will be refused." (Pl. SMF at ¶ 68; Benton Dep. at 98, 380; Pl.Ex. 14.) The letter further stated that, if the plaintiff agreed to sign the new contract and pay the additional charges, Baker and plaintiff could agree upon a new number for the attendance limit. (Pl.Ex. 14.) McCarthy told the plaintiff that it would "behoove" her to take the letter, and both he and Baker told the plaintiff she had until 4:00 p.m. that day to respond to the letter. (Pl. Resp. to Marriott SMF at ¶ 33; Benton Dep. at 98, 380.) Plaintiff did not sign the new contract and thus in her last communication with Baker and McCarthy on December 16, she was advised that her show would be limited to forty-five persons in attendance. (Pl. SMF at ¶ 68.)

At some point during the afternoon of December 16, Baker also had a conversation with Mants, in which they discussed the holiday bazaar and plaintiff's refusal to sign a new contract. (Pl. SMF at ¶ 69.) Baker told Mants that the plaintiff was playing "hardball" in refusing to sign the new contract and that, if the plaintiff was going to play "hardball," then Baker would play "hardball," too. (Pl. SMF at ¶ 69; Mants Dep. at 183; Baker Dep. at 142.) Baker also told Mants that if the plaintiff

insisted on sticking with the original contract, then the show would be limited to only forty-five people in attendance, as reflected on that contract. (*See* Baker Dep. at 141.) Mants responded to Baker that it would be a shame if those forty-five people turned out to be press and civil rights leaders, and Baker agreed that it would indeed be a shame. (Baker Dep. at 141.) Baker, however, later said to Mants that the show "was going to go on" and indicated they would not restrict access to the event. (Mants Dep. at 183.)

The bazaar was held on Thursday, December 17, 1998. The vendors participating in the bazaar were not allowed to use the loading dock or elevators to unload their merchandise. (Pl. SMF at ¶ 69; Wofford Dep. at 54–55.) The vendors were instead required to use a set of stairs from West Peachtree Street to gain access to the conference rooms. (Pl. SMF at ¶ 70; Wofford Dep. at 55.) Baker stated that she was surprised that the vendors were being forced to use the stairs because of the "extra effort" that was required. (Baker Dep. at 146.)

Wofford was told by someone working at the loading dock that McCarthy had instructed the Plaza security personnel not to assist the plaintiff's group in any way. (Pl. SMF at ¶ 70; Wofford Dep. at 53–54.) While Baker allowed them to hang signage in areas of the Plaza controlled by Marriott, she did not have the authority to allow them to hang signs in areas controlled by Cousins. (Benton Dep. at 118.) Accordingly, Wofford was also told that she could not use the building's drop mail system to distribute flyers, nor could she distribute flyers outside the building or on the sidewalk in front of the building; rather, she would have to go to the MARTA station down the street to pass out flyers. (Pl. SMF at ¶ 71; Wofford Dep. at 58–59.) Baker and other Marriott staff, however,

did assist members of the plaintiff's group with the copying of flyers that were distributed in the building cafeteria. (Marriott SMF at ¶ 40.) In addition, the cafeteria workers were instructed to inform patrons of the event.

Although McCarthy was not scheduled to be at work on December 17, he came in on his day off to check on the plaintiff's show, and he brought his children with him to attend the show. (Cousins SMF at ¶ 20; Pl. SMF at ¶ 72; McCarthy Dep. at 224–225.) He checked in with Baker to inquire about the show and was seen in a balcony area overlooking the show. (Pl. SMF at ¶ 72; Benton Dep. at 125.)

Plaintiff contends that, as a result of the interference from the defendants, the holiday bazaar was very poorly attended, and that she lost approximately $300–$400 on the event. (Pl. Resp. to Marriott SMF at ¶ 42; Mants Dep. at 139.) Plaintiff states that many vendors pulled out of the show and that she refunded money to vendors who attended the show, but she does not detail the reason she gave such refunds. (Pl. SMF at ¶ 74; Mants Dep. at 139.) No parties have presented evidence regarding the approximate number of attendees or the number of vendors that participated in the show. It is undisputed, however, that no persons were ever refused entry into the show. (Marriott SMF at ¶ 45; Pl. SMF at ¶ 73.)

After the bazaar, Arnold began to receive "nitpicking" complaints from McCarthy about the operation of the shoeshine stand that he had never received before the holiday bazaar. (Pl. SMF at ¶ 75; Arnold Dep. at 75.) McCarthy complained to Arnold about an "unauthorized" person operating the stand, who was plaintiff's assistant, James Crayton. (Arnold Dep. at 64.) Crayton had been working at the stand with plaintiff on a full-time basis since the beginning of September, 1998, but McCarthy had never complained to

Arnold about Crayton working at the stand before. (Pl. SMF at ¶ 75; Arnold Dep. at 145.)

Two or three days after the bazaar, Arnold received a phone call from McCarthy stating that Cousins was not satisfied with plaintiff's performance at the shoeshine stand, but he did not give Arnold specific reasons for his dissatisfaction. (Pl. SMF at ¶ 77; Arnold Dep. at 71–72.) Arnold was satisfied with plaintiff's performance operating the shoeshine stand and found her to be very conscientious. Indeed, out of all the people who had worked for him or who had contracted with him to perform work, he considered her to be the best, because she always did everything he asked her to do. (Pl. SMF at ¶ 77; Arnold Dep. at 72–73.) Furthermore, according to the plaintiff, McCarthy had also told her during their meeting on December 11 that she was doing a good job running the shoeshine stand. (Pl. SMF at ¶ 77; Benton Dep. at 52.) Nevertheless, McCarthy told Arnold he wanted plaintiff "out of there" and told Arnold that he had to find someone else to operate the shoeshine stand. (Pl. SMF at ¶ 77; Arnold Dep. at ¶ 72.)

Arnold informed plaintiff that McCarthy wanted her out of the building and plaintiff told Arnold that she would be willing to leave if she received a letter from Cousins explaining the reasons it wanted her out. (Pl. SMF at ¶ 78; Arnold Dep. at 58.) Arnold then relayed that request to McCarthy, who told Arnold that he would discuss plaintiff's request with the Cousins' legal department. (Pl. SMF at ¶ 78; Arnold Dep. at 58.) Plaintiff also wrote a letter to Beauchamp dated January 13, 1999, asking Beauchamp for a written explanation of why Cousins was complaining about her operation of the shoeshine stand when she had received no complaints prior to the holiday bazaar. (Pl. SMF at ¶ 78;

Benton Dep. at 372–374, Ex. 30; Arnold Dep., Ex. 4.) Plaintiff stated in the letter that it was her belief that Cousins' sudden dissatisfaction with her performance operating the shoeshine stand was related to the holiday bazaar. She further informed Beauchamp that she intended to continue operating the shoeshine stand until she received written notice from Cousins that she would not be permitted to do so anymore. (Benton Dep., Ex. 30.)

Cousins contends that, on more than one occasion, the plaintiff left the shoeshine stand unattended during the required operating hours and that she also allowed an "unauthorized person" to work at the shoeshine stand in her absence. (Cousins SMF at ¶ 24; Beauchamp Dep. at 146–147; McCarthy Dep. at 236.) Cousins contends that McCarthy, with the approval of Beauchamp, made the decision in February, 1999, to terminate the arrangement with Doc Arnold as a result of its dissatisfaction with plaintiff's operation of the shoeshine stand. (Cousins SMF at ¶ 26; Beauchamp Dep. at 144.)

Approximately one month after McCarthy told Arnold he would discuss plaintiff's request with the Cousins' legal department, McCarthy called Arnold and informed him that Cousins was terminating its agreement with him over the shoeshine stand. (Arnold Dep. at 58.) Soon afterwards, Arnold received a letter from McCarthy dated February 5, 1999, that stated it was serving as "formal notification" that Cousins was terminating any and all agreements between Cousins and Arnold and that Arnold should advise any persons operating the shoeshine stand that their services would no longer be required after February 12, 1999. (Arnold Dep., Ex. 5.) The letter further stated:

> As we have previously discussed, we are not satisfied with the operation of the shoeshine stand. Specific complaints that we have made to you have not been resolved to our satisfaction, primarily concerning staffing with persons who have not been approved by the property management office and consistent operation according to the established hours. We feel it is necessary to make a change.

(Arnold Dep., Ex. 5.)

McCarthy stated during his deposition that Arnold had previously told him that he was no longer benefitting financially from the shoeshine stand and that Arnold thought it was a good idea if they did not continue the arrangement, a contention that Arnold disputes. (McCarthy Dep. at 233; Arnold Dep. at 103.) Nevertheless, the parties all agree that, on February 12, 1999, plaintiff stopped operating Plaza Executive Shine and Arnold stopped managing Plaza Executive Shine. (Cousins SMF at ¶ 26; Pl. SMF at ¶ 80.) The defendants then entered into an arrangement with James Arnold, an African–American man, to operate the Plaza's shoeshine stand. (Cousins SMF at ¶ 27.) Currently, James Prince, also an African–American man, operates the stand. (*Id.*)

During the entire time the plaintiff operated the shoeshine stand from November, 1997 through February, 1999, plaintiff had never heard any racially discriminatory comments or remarks from Beauchamp, McCarthy, or any other Cousins employee. (Cousins SMF at ¶ 6.) Furthermore, plaintiff never heard Baker or any other employee of Sodexho Marriott use any racially derogatory terms. (Marriott SMF at ¶ 49.)

On November 2, 2000, plaintiff filed the Complaint [1] that initiated the instant action, asserting claims against Sodexho Marriott, Cousins, McCarthy, Beauchamp, and Baker for racial discrimination and conspiracy to deprive her of her civil rights under 42 U.S.C. §§ 1981, 1985, 1986, and 2000a. On that same day, she also filed a

complaint in Fulton County Superior Court alleging various state law claims against the defendants, including claims for breach of contract, tortious interference with business relations, tortious interference with contractual relations, conspiracy, and intentional infliction of emotional distress. The case in Superior Court was later removed to this Court and consolidated with this action in an Order dated August 22, 2001[18]. After multiple extensions of the discovery period, discovery ended on November 16, 2001, and the deadline for filing motions for summary judgment was extended until December 21, 2001, on which day the Marriott defendants and the Cousins defendants filed separate motions for summary judgment [56][57], both of which are now pending before the Court. The Court addresses both of those motions, as well as several other pending motions herein.

## DISCUSSION

### I. *Plaintiff's Motions to File Supplements and Sur–Replies*

Plaintiff has filed several motions seeking leave from the Court to file supplements to her responses to defendants' various motions. She has also sought leave from the Court to file a surreply to defendants' motions for summary judgment.

Plaintiff filed her initial briefs in response to defendants' motions for summary judgment [66][67] on March 7, 2002. One week later, on March 14, 2002, she filed a Motion to Supplement her Responses to defendants' Motions for Summary Judgment [71], seeking leave from the Court to file supplemental briefs that corrected errors and provided additional citations to the record. Defendants have not opposed plaintiff's request to file her supplemental briefs, and the Court finds that defendants are not prejudiced by allowing plaintiff to file the supplemental briefs. Furthermore, on March 19, 2002, plaintiff filed a Motion to Supplement her Response to defendants' Statements of Material Facts [75], which also appears to be unopposed by defendants, and the Court also finds that defendants are not prejudiced by allowing plaintiff to correct citation errors in her supplemental response to defendants' statements of fact.

Accordingly, plaintiff's Motion to Supplement her Responses to defendants' Motions for Summary Judgment [71] and plaintiff's Motion to Supplement her Response to defendants' Statements of Material Facts [75] are **GRANTED**.

After defendants filed their reply briefs in support of their motions for summary judgment, on April 15, 2002, plaintiff filed a Motion for Leave to File a Sur–Reply to defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [84]. On April 23, 2002, she filed a Motion for Leave to File a Sur–Reply to defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [87]. On April 24, 2002, she filed a Motion for Leave to Supplement her Sur–Reply to all defendants' Motions for Summary Judgment [88].

■ Defendants have opposed plaintiff's motions on the grounds that the Local Rules do not allow for the filing of a "sur-reply." Plaintiff has not provided the Court with any explanation for why a sur-reply is warranted in this case, other than that the plaintiff wanted to repeat and expand her arguments made in her initial response briefs to defendants' motions for summary judgment. The Court agrees with defendants and concludes that plaintiff has failed to provide any reason why the Court should grant plaintiff's motion to file a sur-reply. If the plaintiff objects to any evidence submitted in connection with the defendants' reply briefs, the proper procedure would be to file a Notice of Objection to the specific evidence, not a

sur-reply to rehash all the arguments already presented in the response brief and to get "another bite at the apple."

Accordingly, plaintiff's Motion for Leave to File a Sur–Reply to defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [84], plaintiff's Motion for Leave to File a Sur–Reply to defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [87], and plaintiff's Motion for Leave to Supplement her Sur–Reply to all defendants' Motions for Summary Judgment [88] are all **DENIED**. The Court has not considered plaintiff's "sur-replies" in deciding the issues raised in the defendants' motions for summary judgment.

## II. Motions to Exceed the Page Limit

In connection with the parties' motions for summary judgment and other motions discussed above, the parties also filed motions seeking leave from the Court to file briefs exceeding the page limits provided in the Local Rules. Defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion to File a Memorandum of Excess Pages [54]; defendants Sodexho, Inc.'s and Tracy Baker's Motion to File Memorandum of Excess Pages [55]; plaintiff's Motion to File a Response Brief Exceeding the Page Limitation [68]; and defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's (Second) Motion to Exceed the Page Limits [80] are all **GRANTED**.

## III. Defendants' Motions for Summary Judgment With Regard to Section 1981 Claim Relating to Defendants' Performance of the Rental Contract for a Conference Room

Plaintiff has asserted several claims under federal law and state law against all the defendants. The Cousins Defendants and the Marriott Defendants have filed separate motions for summary judgment on all of plaintiff's claims. Because the issues raised in both motions are inextricably intertwined, the Court will discuss both motions together, but will separately address any issues that relate only to specific defendants, as necessary.

### A. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence, including affidavit and deposition testimony, answers to interrogatories, and other such evidence, designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324,

106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

**B. *Standard, Generally, for Section 1981 Contract Claim***

Plaintiff's first claim is brought under 42 U.S.C. § 1981 ("Section 1981"), for racial discrimination in the making and enforcement of contracts. All defendants have moved for summary judgment on plain-tiff's claim under Section 1981. Section 1981 provides, in pertinent part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, liens, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Plaintiff has asserted a claim against all defendants under Section 1981 based on her allegation that the defendants, acting in concert with one another, deprived her of the enjoyment of all the benefits, privileges, terms, and conditions of the contractual relationship that she had with Marriott when she arranged to rent a conference room from Marriott for the holiday bazaar. The gravamen of plaintiff's claim is that, although Marriott honored the literal terms of its written agreement with plaintiff, in that it did provide a conference room for her to use for the holiday bazaar, the Marriott and Cousins defendants acted together to deprive the plaintiff of the customary benefits and privileges that were typically provided to white persons who rented conference rooms at the Plaza and that these defendants did so

because plaintiff is black.[11] Specifically, plaintiff complains that she was denied the use of the loading dock and elevators, that she was denied use of telephones in the conference room, and that defendants were unduly restrictive in allowing her to distribute flyers promoting her event. Plaintiff's overriding complaint is that the defendants were rude to her and, more particularly, that defendant Marriott repeatedly hassled her in an effort to get her to pay for the additional janitorial and security services that would be required as a result of the size of plaintiff's planned event.

A Section 1981 action must be based on intentional racial discrimination that affects at least one of the contractual aspects listed in Section 1981(b): to wit, the making and performance of a contract, and the enjoyment of all its benefits, privileges, terms and conditions. Thus, a Section 1981 claim requires a showing both of an *actus rea*—that is, a failure to perform a contractual obligation—and a *mens rea*—non-performance as a result of an intention to discriminate racially. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (Section 1981 "can be violated only by purposeful discrimination"). As discussed *infra*, plaintiff has failed to show either that defendants failed to confer the benefits and conditions of the contract to which the parties had agreed or that any negative interaction between defendants and plaintiff resulted from a racially discriminatory animus.

In evaluating motions for summary judgment regarding discrimination claims where a plaintiff has no direct evidence of discrimination, courts generally use the burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superseded in part* by the Civil Rights Act of 1991. Under this analytic scheme, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Once a plaintiff establishes a *prima facie* case, which thereby permits an inference of discrimination, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse action and must produce some evidence in support of that reason. *Id.; see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant is able to meet this burden of production, the plaintiff, to survive summary judgment, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089.

This *McDonnell Douglas–Burdine* framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases alleging racial discrimination, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir.1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Nix*, 738 F.2d at 1184 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

**11.** Plaintiff also claims that Cousins violated Section 1981 when it terminated its arrangement with Doc Arnold to operate the shoeshine stand. This sub-claim is discussed *infra* at 69.

■ There is little case authority concerning the requirements of a *prima facie* case for cases alleging racial discrimination in the context of a commercial business dispute, where there is no employer/employee relationship.[12] Extrapolating the pertinent elements of the *McDonnell Douglas* analysis[13] to a Section 1981 contract claim, plaintiff must demonstrate the following elements to establish a *prima facie* case of race discrimination: (1) that she is a member of a protected class; (2) that the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute; *i.e.*, the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (3) that the defendants treated the plaintiff less favorably with regard to the allegedly discriminatory act than the defendants treated other similarly situated persons who were outside plaintiff's protected class. Stated another way, the third prong requires plaintiff to show an apt comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff.[14]

**12.** Defendants argue that the Eleventh Circuit requires a plaintiff asserting a racial discrimination claim under Section 1981 to produce evidence not only that she was treated differently from other customers, but also to produce evidence of "actual intent" on the part of the defendant. (*See* Cousins Def. Br. [57] at 13.) As the Eleventh Circuit stated in *Rutstein*, "[t]he second requirement is more demanding than any of the requirements imposed on plaintiffs in a *McDonnell Douglas* case, requiring, as it does, that the plaintiff bring forth evidence of actual intent on the part of the defendant." *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1239 (11th Cir.2000).

The Court notes, however, that *Rutstein* involved a class action, and the quote above was distinguishing between a *"Teamsters"* class action case and a *"McDonnell Douglas"* type of disparate treatment case. *See Rutstein*, 211 F.3d at 1238–1239. Under *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a class of plaintiffs may prove discrimination by establishing a "pattern or practice" of discrimination by a defendant company, whereas under *McDonnell Douglas*, an individual plaintiff must prove that she was personally the subject of discrimination. *See Rutstein*, 211 F.3d at 1238–1239. In the instant action, the plaintiff is not claiming that defendants had a "pattern or practice of discrimination," but she is contending only that they discriminated against *her*. Under *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and a long line of cases following *Patterson*, plaintiff's Section 1981 claim, even though brought in a non-employment context, must be analyzed under the *McDonnell Douglas* framework. Under that framework, as discussed above, the plaintiff is not required to produce *direct* evidence of a discriminatory motive. Instead, she can produce *circumstantial* evidence of a discriminatory motive. Thus, although some cases may state that a plaintiff alleging racial discrimination under Section 1981 is required to produce evidence of "actual intent," the Supreme Court has made it clear that the plaintiff is not required to produce direct evidence of a discriminatory intent and she may instead support her claim through circumstantial evidence of disparate treatment.

**13.** Under a traditional application of the McDonnell Douglas test to a standard employment claim, the plaintiff can establish a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she was subjected to an adverse job action; (3) her employer treated other similarly situated employees outside her protected class more favorably; and (4) she was qualified to do the job. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *see also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

**14.** The defendants argue that, in order to present a *prima facie* case under Section 1981, the plaintiff must present evidence to establish (1) that she is a member of a protected class; (2) that the defendants had an intent to discriminate on the basis of race;

Applying this test to the plaintiff's evidence, the Court concludes that she has failed to make a *prima facie* case of racial discrimination. There is no dispute that, as an African–American, plaintiff is a member of a protected class, which is the first prong of the test. Yet, plaintiff has failed to present evidence that would demonstrate either the second or third prong of the test. Specifically, as to the second prong, plaintiff has failed to show that the defendants failed to perform [15] any contractual obligation that they undertook with regard to the plaintiff or that they acted to deprive her of the enjoyment of any of the benefits, privileges, terms, or conditions of that contractual relationship. As to the third prong, plaintiff has failed to produce evidence of any similarly situated white comparator who was treated differently than plaintiff with regard to the allegedly discriminatory acts.

## C. *Plaintiff Has Failed to Show That Defendants Deprived Her of Any Benefits to Which She Was Entitled Under Her Contract*

As noted above, as a conceptual matter, a Section 1981 claim requires a showing both of an *actus rea*—a failure to perform a contractual obligation—and a *mens rea*—an intent to discriminate racially. Before examining whether the defendants bore a discriminatory intent, the plaintiff must first produce evidence demonstrating that the defendants acted to deprive her of benefits to which she was entitled under her contract, which, as noted, is the second prong of the *prima facie* test. Stated another way, the plaintiff must show that the defendants actually did something wrong before she can call on a court to gauge whether there was any racial motivation behind their actions.

### 1. *Backdrop*

As set out in the factual recitation *supra*, the backdrop of this entire dispute

and (3) the discrimination concerned one or more of the activities enumerated in the statute, *i.e.,* the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *See, e.g., Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996); *Green v. State Bar of Texas,* 27 F.3d 1083, 1086 (5th Cir.1994).

The Sixth Circuit has criticized the above test, arguing that, by requiring a proof of discriminatory intent, this test collapses the requirements for *proving* a Section 1981 claim with the requirements for presenting only a *prima facie* case. *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 872 (6th Cir.2001). Accordingly, the Sixth Circuit has adopted an alternative *prima facie* standard for a Section 1981 case, whereby the plaintiff must prove that:
 (1) plaintiff is a member of a protected class;
 (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and

 (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.
*Christian,* 252 F.3d at 872 (citing *Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 705 (D.Md.2000)).

This Court essentially adopts the Sixth Circuit's test, except for its sub-section(3)(b). As discussed *infra,* this Court concludes that (3)(b)is legally incorrect and is unhelpful in analyzing these claims.

**15.** Plaintiff has not, nor could she, argue that the defendants refused to make a contract with her. Indeed, defendant Marriott did enter into a contract with plaintiff to rent a room for plaintiff to hold her function and plaintiff, in fact, held that function on the appointed date.

was the miscalculation initially by a Marriott representative about the appropriateness of booking a function such as plaintiff's into a conference room, which misunderstanding was amplified by plaintiff's perhaps innocent, but nonetheless false, assertion in the written agreement that only twenty people would be in attendance at this function. In fact, plaintiff intended to solicit the participation of numerous vendors and hoped that hundreds of people would visit the bazaar. Plaintiff's function was inappropriate because Cousins, the owner of this upscale office building, had never before ceded its authority to a private entity to conduct a public bazaar, consisting of multiple vendors unapproved by Cousins.[16] While Cousins had, on occasion, sponsored a specialty retail sale put on by a single vendor, such as the Monet Jewelry Show, in those situations, Cousins had screened the vendor and was able to exercise ultimate control over the function. Moreover, in those situations, Cousins had also profited financially from the venture, as it always required the vendor to contribute part of the proceeds to charity in Cousins' name. Further, in those situations, the event was conducted in an open space, appropriate for handling large traffic, not in a small conference room. Finally, whenever Cousins had sponsored a specialty sales event in its gallery, it had also provided security and janitorial services to ensure that the event proceeded smoothly.

Once Cousins became aware that Marriott, which controlled the rental of conference rooms in the facility, had signed this contract with plaintiff, it made clear its concerns. Most significantly, it insisted that Marriott would have to be responsible for the costs of providing security and janitorial services due to the potentially large traffic that would be passing through the facility to the conference room bazaar. Moreover, it is fair to say that Cousins was very displeased about the event and would have liked for plaintiff to cancel it. Nevertheless, Cousins allowed the event to go forward, albeit Cousins consistently sought to distance itself from any sponsorship of or support for the event.

As to Marriott, once other Marriott representatives became aware of the implications of Ms. Baker's rental agreement with plaintiff, they likewise communicated to plaintiff their unhappiness about the venture. In particular, as Cousins had insisted that Marriott be responsible for the extra expenses associated with security and janitorial service, Marriott repeatedly tried to cajole plaintiff into signing an agreement obligating herself to pay for these expenses. Plaintiff always refused, relying on the letter of her own agreement, which did not mention such expenses. Yet, while plaintiff took a literal approach toward accepting any unspecified obligations on her part, such as janitorial and security expenses, she objected when defendants took a literal approach and refused to offer her amenities that were likewise not mentioned in the contract. The back and forth wrangling of the parties, and the friction that resulted, have been detailed, at length, in the factual recitation *supra*. It is against the above backdrop that the Court analyzes whether either defendant failed to accord plaintiff with any benefits to which she was entitled under her contract.

---

**16.** Indeed, as noted *supra* at 1360 n. 8, Cousins did not allow its own licensors to sub-let space rented to them by Cousins and obviously had never envisioned that Marriott would book a conference room where the intended use was to conduct a bazaar. Moreover, as noted *supra* at 1359, Marriott indicates that it had never before, and will never again, book an event such as plaintiff's into the Plaza conference facilities.

## 2. *Marriott Defendants*

The Marriott Defendants argue that plaintiff has failed to present any evidence that they failed to honor any portion of their contract with her or otherwise denied her any benefits, terms or privileges under that contract. This Court agrees with Marriott. Marriott promised to provide plaintiff with a conference room [17] on the date specified; it did so. Moreover, Marriott had, at one point, indicated to plaintiff that if she refused to pay for the security and janitorial expenses, Marriott would refuse to admit any more than forty-five people into her rented conference rooms: a restriction that Marriott was presumably permitted under the contract. Nonetheless, it is undisputed that Marriott never actually turned anyone away from the event.

Plaintiff also complains that Marriott did not provide telephones for the bazaar. While the parties dispute whether plaintiff or any other member of her group ever requested that phones be available in the conference rooms on the day of the event, Baker has testified that, although it was not standard practice to have phones inside the conference room, she could have made a phone available if requested. (Baker Aff. ¶ 14.) More important than the question whether plaintiff requested telephones is the fact that the contract, on which plaintiff literally relies as to some terms, nowhere indicates that telephones would be provided. In short, although plaintiff was unwilling to renegotiate the contract price to secure additional services and benefits beyond the discounted room rental rate, she nevertheless expected a variety of incidentals to be provided to her, free of charge. Her expectation, however, was not reflected in the contract, and any disappointment of that expectation does not constitute a failure to accord plaintiff the benefit of her contract.

Moreover, although Marriott could not grant access to areas of the Plaza controlled by Cousins, they allowed plaintiff to post signs advertising the event in areas controlled by Marriott, although presumably they were not required to do so by the contract. Further, while Cousins would not allow the distribution of flyers in their internal mail system, Marriott staff assisted plaintiff in the copying of flyers to be passed out on the street, and also allowed these flyers to be distributed in the building cafeteria, which was run by Marriott. Finally, plaintiff's own partner in this venture testified that, although Ms. Baker repeatedly tried to get plaintiff to sign an amended contract obligating plaintiff to cover janitorial and security expenses, Ms. Baker was nonetheless "responsive" in trying to help with the show.

The above facts compel a conclusion that Marriott did not violate any of its contractual obligations toward plaintiff and that, in fact, it offered plaintiff some services that were not required by the contract. As Marriott did not deny plaintiff any benefits of her contract, plaintiff's claim fails, independent of any exploration of the subjective racial views of Marriott personnel.

## 3. *Cousins Defendants*

The Cousins Defendants contend that as plaintiff's contract was with Marriott, not Cousins, it is impossible for her to argue that Cousins failed to satisfy any obligations that it had to plaintiff. Cousins' argument is largely persuasive. While nothing in the language of Section 1981 requires that a *written* contract be in place before a party may assert a claim,[18] the Court nevertheless concludes that no con-

---

**17.** Actually, subsequent to the signing of the original contract providing for a single conference room at the tenant rate of $321, plaintiff rented a second conference room, indicat-

ing now that "forty-five," not twenty people, would be in attendance.

**18.** At-will employment contracts, for example, are almost always verbal, not written, and are

tract existed between plaintiff and Cousins in the case at hand. First, plaintiff provided no consideration to Cousins. See O.C.G.A. § 13-3-42 ("a performance or a return promise must be bargained for by the parties to a contract.") In contrast to other vendors who sponsored sales events pursuant to an explicit agreement with Cousins, plaintiff did not agree to donate a percentage of revenue to charity on Cousins' behalf in return for use of Cousins' venue space and auxiliary services. Furthermore, even when Cousins arranged to provide services for plaintiff's event, Cousins billed Marriot, with whom it did have a contractual relationship, thereby indicating that Cousins never had the intent to contract with plaintiff.[19] Based on her refusal to pay for security and janitorial services, plaintiff was therefore allowed the benefit of only "customary services" free of charge. (Pl. Dep. at 323, 326.)

Accordingly, since no contract existed between Cousins and plaintiff as to the

Bazaar, it would appear that Cousins is entitled to summary judgment on plaintiff's Section 1981 claims concerning the bazaar. *See Lane v. Ogden Entm't, Inc.*, 13 F.Supp.2d 1261, 1272 (M.D.Ala.1998) (noting that if plaintiff has no contract, he has no Section 1981 claim which applies solely to contracts); *Dunn v. Uniroyal Chem. Co., Inc.*, 192 F.Supp.2d 557, 561 (M.D.La.2001) (dismissing plaintiff's Section 1981 claim because plaintiff had no contract with defendant). Nevertheless, the Court will also review plaintiff's list of grievances in the context of analyzing whether Cousins deprived plaintiff of any contractual rights that Cousins was obligated to perform via its relationship with Marriott.

At the outset, the Court repeats that the biggest dispute between the parties revolved around the expenses that would be incurred for janitorial and security services for a potentially big event, such as plaintiff's holiday bazaar. It bears men-

terminable at the will of either party, but they are nevertheless considered "contracts" deserving of protection under Section 1981. *See Lauture v. Int'l Bus. Mach. Corp.*, 216 F.3d 258, 260 (2nd Cir.2000); *Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir.1999); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018–19 (4th Cir.1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1051–52 (5th Cir.1998). Furthermore, in amending Section 1981 in the 1991 Civil Rights Act, Congress intended to expand the scope of Section 1981 to cover a broad spectrum of racial discrimination in all aspects of contractual relations. *See Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir.1998) (noting that the 1991 Act's legislative history is "replete with expressions of Congress's intent to broaden section 1981 ... in all phases of contractual relations").

19. Although plaintiff argues that Cousins agreed to provide extra janitorial and security services at no cost to her, the evidence reflects that, at most, they informed her that Cousins would be billing Marriot for the

charges. Plaintiff has not shown that she was told specifically that Marriott would be paying the costs for these extra services to Cousins or that Marriot would *not* be billing her for the charges. Although it may have been her expectation that she would not be charged, she has presented no evidence that Beauchamp or McCarthy ever made any promise to her regarding what Marriott would do, nor did they have any authority to make any promises on behalf of Marriott. Further, the evidence reflects that it was Dunham's decision on behalf of Marriott to bill the plaintiff for the additional charges for the janitorial and security services. Plaintiff has presented no evidence that McCarthy and Beauchamp had any input into that decision. It is further undisputed that Baker is the person who repeatedly attempted to persuade the plaintiff to sign the new contract with Marriott, through which the plaintiff would have accepted responsibility for the additional charges being imposed on Marriott by Cousins. In any event, the plaintiff refused to pay, and was not assessed, any additional charges beyond what she had previously agreed to pay for the room rental fee.

tioning that Cousins did not use the existence of these expenses as an excuse to prevent the holding of the bazaar. Instead, Cousins required Marriott to be responsible for these costs, not plaintiff. Further, although Cousins required plaintiff to obtain a certificate of insurance for the event, which she did, it is undisputed that the Cousins' standard guidelines concerning "Conference Center/Executive Dining Events" require such a certificate for any "vendor, exhibitor or contractor that utilizes Marriott Sodexho space." (Cousins' Letter to Marriott attach. as Ex. 2 to McCarthy's Dep.; *see also* "Dress Code" Cert. of Ins. attach. as Ex. 35 to Beauchamp Decl.) Indeed, as noted, plaintiff received a benefit not accorded those individuals, because, unlike plaintiff, they had actually been required to pay for their own security.

Plaintiff also complains that she was not allowed to use the elevators, but the evidence indicates that Cousins had informed plaintiff that if her bazaar vendors wished to use the elevators, they would have to pay for padding to ensure that the elevators were not damaged; again, plaintiff refused to do so. Thus, while it is true that plaintiff was not granted free signage, access to the elevators for her vendors to load their equipment, or access to the mail-drop boxes, for purposes of distributing internal flyers,[20] plaintiff had no contract with Cousins that would have entitled her to these benefits.

Viewing the evidence in the light most favorable to the plaintiff, the Court concludes that the plaintiff's allegations amount, at most, to "poor service," but are insufficient to establish a Section 1981 violation.[21] *See, e.g., Douglass v. United Servs. Auto Ass'n.,* 79 F.3d 1415, 1430 (5th Cir.1996) (noting that plaintiff's subjective belief that she was being targeted is not enough to withstand summary judgment); *Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir.1996) (granting defendants' summary judgment when plaintiffs had not shown that defendants denied them admittance to premises, service in the store, and did not ask them to leave); *Wells v. Burger King Corp.,* 40 F.Supp.2d 1366, 1367 (N.D.Fla.1998) ("granting summary judgment to restaurant and noting that customer's allegations that server was "nasty and abrasive" were immaterial under Section 1981"). Accordingly, the Court finds that plaintiff has failed to present sufficient evidence to establish a genuine issue of material fact over whether she was denied the benefits, privileges, terms or conditions of her contract with Marriott, indirectly, through the action of Cousins. Accordingly, the Cousins defendants are entitled to summary judgment on this claim.

### 4. *Defendants' Rudeness Toward Plaintiff Does Not Create a Section 1981 Claim*

■ Before leaving the second prong of the *prima facie* test, the Court should note that plaintiff has also complained about the rudeness that the defendants exhibited toward her during the interaction between the parties leading up to the date of the bazaar.[22] All three parties behaved unpro-

---

20. Because Cousins was not sponsoring the event, it did not permit distribution of flyers to its tenants, which distribution may have occurred on events that Cousins sponsored. As plaintiff had no contract with Cousins, she cannot complain about their refusal in this regard.

21. This case is replete with evidence of miscommunication, misunderstandings, and, above all, poor judgment by defendants in the manner in which they conducted themselves. A more deft, tactful approach by defendants may have averted this litigation.

22. Plaintiff is most concerned about the persistent conduct of defendant Marriott in re-

fessionally in this matter and the Court will assume that defendants were sometimes rude to plaintiff. To the extent that plaintiff is contending that rudeness, alone, even extreme rudeness, can constitute a separate sub-category of a Section 1981 claim, this Court disagrees. The world of commercial business dealings can be a Darwinian, "every man for himself" milieu. If federal courts were called on to act as a civility referee of ill-mannered behavior by entrepreneurs, these courts' dockets would quickly collapse under the sheer weight of these complaints, as such conduct is presumably rampant.

That being said, the Court does not disagree that if "harassing" conduct becomes so extreme as to prevent a plaintiff from enjoying the benefits of her contract, it could conceivably be actionable under Section 1981. Indeed, it was the purpose of Congress in enacting the portion of the Civil Rights Act of 1991 that amended Section 1981 to insure that the latter statute covered prohibited conduct that might occur *after* the formation of a contract. As this amendment was intended to overrule that part of *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that had held to the contrary and as *Patterson* had involved a claim of racial harassment, clearly, one must conclude that Congress did not intend to exempt such harassment from the coverage of the statute. *See Andrews v. Lakeshore Rehab. Hosp.,* 140 F.3d 1405, 1411 (11th Cir.1998) (noting that the 1991 Act's legislative history is "replete with expressions of Congress's intent to broaden Section 1981 specifically to cover race-based retaliation in all phases of contractual relations").

Defining the conduct that will constitute actionable harassment under Section 1981 in a non-employment contract situation is the rub, however. Moreover, articulating a standard to be used in application of the *McDonnell Douglas* test for assessing whether a plaintiff's *prima facie* case has been met is equally difficult. The difficulty arises because, notwithstanding the oft-repeated language of Section 1981 cases touting the statute's prohibition of racial discrimination in the making of contracts, the truth is that Section 1981 cases almost never involve a real contractual relationship. Instead, with only few exceptions,[23] Section 1981 cases involve primarily *employment disputes* in which an employee, who has been fired, denied a promotion, or

peatedly calling plaintiff and insisting that she sign a new contract to pay for additional services. The Court concurs that defendants' persistence would have been quite annoying to plaintiff.

**23.** The few non-employment Section 1981 cases that the Court has found in its admittedly quick scan of the long list of cases brought under this statute include, e.g., *Garrett v. Tandy Corporation,* 295 F.3d 94 (1st Cir.2002)(racial harassment claim under Section 1981 alleged, where white employees reported a black customer as a possible shoplifter to local police); *Arguello v. Conoco, Inc.,* 207 F.3d 803 (5th Cir.2000) (racial harassment claim under Section 1981, where white convenience store clerks allegedly subjected black customers to more exacting review of their identification than that review performed on white patrons who attempted to write a check or use a credit card); *Danco, Inc. v. Wal–Mart Stores, Inc.,* 178 F.3d 8 (1st Cir.1999)(ethnic discrimination claim under Section 1981, where Hispanic independent contractor, who had a contract to perform parking lot maintenance, was subjected to ethnic slurs, newly painted racially offensive graffiti near where the plaintiff worked, and statements by employees that the plaintiff should not be there and that they did not like his kind); and *Webster v. Fulton County,* 283 F.3d 1254 (11th Cir.2002) (white independent contractor brought Section 1981 retaliation claim, where county refused to award contracts to contractor, even when the latter was the low bidder, allegedly because the contractor had previously filed a racial discrimination suit against the county involving its racially discriminatory practices in awarding contracts).

sexually or racially harassed by a supervisor or co-worker, will make both a Title VII and Section 1981 for the same identical conduct.[24] Indeed, the legislative history for the 1991 amendment purportedly references only employees as the object of Congress' concern. *Danco, Inc. v. Wal-Mart Stores, Inc.,* 178 F.3d 8, 14 (1st Cir. 1999). Yet, like the First Circuit, this Court will likewise assume that Congress did not omit independent contractors from coverage under amended Section 1981. *Danco, id.*

The problem of what standard to import from case law that has dealt almost exclusively with employment relationships remains, however. Sometimes the standards adopted in that body of the law will be apt. For example, in *Danco*, a company owned by an Hispanic individual, who had entered into a contractual relationship with a Wal-Mart store to maintain the latter's parking lot, had claimed ethnic discrimination, in violation of Section 1981, after Wal-Mart employees had subjected this Hispanic independent contractor to ethnic slurs, newly painted racially offensive graffiti near where he worked, and statements that the plaintiff should not be there and that the employees did not like his kind. The First Circuit concluded that it could properly extrapolate its Title VII hostile work environment requirements to the *Danco* case. Accordingly, the Court held that the plain-

tiff there had to prove (1) the existence of a contractual relationship; (2) that the plaintiff was exposed to comments, jokes, or acts of a racial nature by the defendant's employees; and (3) that the conduct had the purpose or effect of interfering with plaintiff's work performance or that it created an intimidating, hostile, or offensive work environment. Moreover, the plaintiff had to show more than a few isolated incidents of racial enmity. *Danco,* 178 F.3d at 16.

Clearly, if *Danco* provided an apt standard for this case, the plaintiff would not succeed, as there were no racial comments here. Indeed, plaintiff had worked for some period of time as the operator of the building's shoeshine stand and has nowhere indicated that the work environment was racially or otherwise harassing.

Moreover, as noted *supra* at 1370–71 n. 14, the Court does not find helpful the Sixth Circuit's formulation of a *prima facie* case for allegedly rude service in the retail sector. In *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 872 (6th Cir.2001), the plaintiffs claimed a Section 1981 violation because of allegedly rude treatment by a department store clerk, purportedly as a result of the race of one of the plaintiffs'.[25] The Sixth Circuit indicated that, to make a *prima facie* case for a Section 1981 claim, the plaintiff had to prove that: (1) she was

---

**24.** Of course, plaintiffs who have not filed a timely complaint with the EEOC or who have not filed a suit within 90 days after the EEOC has closed its investigation, as it required by statute, will sometimes file a Section 1981 claim, alone, as the latter statute does not contain such procedural hurdles. Thus, as a practical matter, a sloppy plaintiff can ignore all the careful procedural requirements that Congress has set out as a predicate to filing an employment discrimination claim simply by filing a Section 1981 claim. Unfortunately, because Congress has not seen fit to coordinate and harmonize the procedural requirements for all employment

discrimination statutes, this presumably unintended result continues to impact and complicate employment cases.

**25.** In *Christian*, a white woman and black woman were shopping together in a department store. Allegedly, the store clerk was friendly to the white woman, but not helpful to the black woman, although ultimately it was the white woman who was accused of shoplifting, after which both women were escorted out of the store. Both women subsequently brought a Section 1981 claim, which the Sixth Circuit sustained.

a member of a protected class; (2) she sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) *plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. Christian*, 252 F.3d at 872 (citing *Callwood v. Dave & Buster's, Inc.*, 98 F.Supp.2d 694, 705 (D.Md.2000)) (emphasis added).

As noted, the Court does not find Section (3)(b) of the *Christian* test for retail establishments helpful in defining the appropriate *prima facie* test to determine whether one party to a contract has been so rude to the other party as to implicate Section 1981. The test requires a finding of the ultimate issue—discrimination—and its operative phrase, "markedly hostile manner," is so vague as to be unhelpful in the context of a business conflict. While there may be a certain level of courtesy expected for retail sales clerks, by which standard one could fairly judge the phrase "markedly hostile manner," there is no such norm for evaluating the civility expected of parties to a contract who are in the full throes of a business dispute.

Armed with no readily applicable test for these facts, the Court will therefore simply state its reasons why it concludes that plaintiff has not set out a *prima facie* case based on the defendants' rude treatment of her. Here, any rudeness that defendants displayed toward

plaintiff was in connection with the parties' dispute over services that plaintiff wanted, but that defendants argued she had not contracted for, and expenses that defendant Marriott believed plaintiff owed, but that she had not agreed to pay. As noted, the overriding concern by defendants was that the Marriott representative had goofed by even signing this contract with plaintiff, as defendants had never rented a conference room under these circumstances before and were displeased about the bazaar going forward. Because any disputes related to the parties' differences concerning their respective obligations under the contract, it therefore follows that any rudeness to which plaintiff was subjected was likewise a result of this business dispute, and not because of plaintiff's race. In other words, plaintiff has made no showing to suggest that defendants would have treated differently a white operator of the shoeshine stand had the latter attempted to hold a holiday bazaar in a rented conference room. *See* discussion *infra.* Finally, whatever anxiety the dispute understandably caused plaintiff, she was never denied the benefit of her contract, as plaintiff did hold her holiday bazaar, as planned.[26]

### D. *Plaintiff has Failed To Show The Existence of Any White Comparators Who Were Arguably Treated More Favorably Than Plaintiff*

As noted, the Court does not have to reach the question of defendants' racial intent because plaintiff has failed to produce evidence demonstrating that defendant's violated the second prong of the *prima facie* test: to wit, that they denied

---

**26.** Plaintiff does complain that her bazaar was poorly attended. Yet, she does not clarify how defendants can be properly held responsible for this. To the extent that the poor attendance can be blamed on the absence of flyers in the building, the Court has concluded that Cousins was not required to allow such flyers to be distributed through the internal mail system and that Cousins had previously allowed such only in markedly different circumstances.

her the benefit of her contract. Nevertheless, for completeness' sake, the Court will also analyze the third prong of the test, which requires comparator evidence.

Plaintiff admittedly does not have admissible direct evidence that any of the defendants used racial slurs or were motivated by a racially discriminatory animus. Nevertheless, she argues that she has presented sufficient evidence that she was treated differently from white customers who rented conference rooms at the Plaza to sustain her burden of presenting a *prima facie* case of discrimination under Section 1981. Specifically, the plaintiff contends that no other person who booked a conference room at the Plaza was subjected to repeated harassment to sign a new contract requiring her to pay for charges that she had not agreed to in her initial contract; no other person who booked a conference room at the Plaza was denied the use of the loading dock and the elevators; and no person who booked a conference room at the Plaza was denied access to telephones. Furthermore, plaintiff also contends that no person who booked a conference room for forty-five people for an event in the daytime was required to pay approximately $1,200 for additional janitorial and security services.[27]

The most glaring problem with plaintiff's claim, however, is that, as she was the *only* person who has ever attempted to hold such an event at the Plaza, obviously, no other person—white or black—has been treated as she was. Again, as noted at length, *supra*, the evidence indicates that, other than plaintiff's bazaar, neither defendant had *ever* permitted "multiple" unrelated vendors to conduct sales anywhere in the Plaza, and certainly had never permitted a privately sponsored vendor event to occur. Defendants have presented evidence that most of the events held in

the conference facilities were business meetings and did not involve the sale of merchandise. In short, plaintiff has presented no evidence that there has ever been any other event similar to her event: an event in which unknown and unscreened multiple vendors would be solicited to apply for tables in a conference room at a rental fee of $100.00, and would be offered the opportunity to sell whatever merchandise they chose to the tenants in the Plaza and to the general public. Plaintiff, therefore, is unable to put forth evidence of one single *similar* comparator—white or black-who was subjected to different treatment.

Even if the Court were to broaden the scope of who could be considered an apt comparator to include any person who hosted a large event in the atrium area, plaintiff has not shown a difference in treatment. That is, other entities that held large events, such as parties, at the Plaza were subject to the same or similar requirements that plaintiff argues demonstrate the defendants' racial motive in the instant case. For example, pursuant to company policy, the defendants always assess the impact of events on the Plaza when determining what events will need additional janitorial or security services so as not to disrupt the tenants in the building. Furthermore, Cousins requires all vendors to obtain management approval for any advertisement sign and requires insurance for large events. (Baker Dep. Ex. 16.) It is also undisputed that Dress Code, which is owned and operated by a white individual, was also required to procure a certificate of insurance because of the number of people expected to attend the event. (Beauchamp Decl. Ex. 35.) Furthermore, at least four organizers of large events hosted by Marriott were *re-*

---

**27.** The Court notes again that while plaintiff was asked to pay the fee, she refused to do so. Her refusal to pay the fee did not impact her ability to host the event.

*quired* to pay for additional security. (Pl. Resp. To Cousins' S.J. Mot. [66] at 40.) Indeed, if one compares plaintiff to these entities, plaintiff was actually treated better than these comparators because she received her added security for free.

As noted, plaintiff admits there is no direct evidence of racial animus in the case at hand. Accordingly, the Court concludes that, with all inferences made in the light most favorable to plaintiff, she has also failed to present any circumstantial evidence that permits an *inference* of a discriminatory motive based on her allegation that the defendants subjected her to treatment different from the treatment accorded similarly situated white customers of the Plaza's conference facilities.

Therefore, for all the above reasons, plaintiff has failed to make a *prima facie* case of discrimination, under Section 1981, in connection with her claim regarding the allegedly inadequate service given to her by defendants in connection with her rental agreement.

## IV. Section 1981 Claim Based on Cousins' Termination of Shoeshine Stand Agreement

As noted, within a short time period after the holiday bazaar, defendant Cousins terminated its agreement with Arnold, the operator of the shoeshine stand in the Plaza, which termination meant that plaintiff would no longer be able to work at that location. Although defendant avers that it terminated its arrangement with Arnold because it was displeased with the operation of the stand, in that plaintiff sometimes left it unattended and had an unapproved assistant, taking the facts in the light most favorable to plaintiff, one could just as readily infer that defendants terminated Arnold because they ·were still miffed with plaintiff as a result of the conflict revolving around the holiday bazaar. Plaintiff brings a Section 1981 claim

as a result of this termination of Arnold's agreement. Because plaintiff's argument can be construed as both a substantive Section 1981 claim and a claim of retaliation under that statute, the Court has analyzed the termination under both frameworks.

### A. Substantive Section 1981 Claim Arising From Termination of Shoeshine Stand Arrangement

On a first glance, one could conclude that because the "contractual" arrangement regarding the shoeshine stand was between defendant Cousins and Arnold, plaintiff cannot be heard to complain about the termination of Arnold. That is, as plaintiff had no contract with Cousins, but instead had an agreement with Arnold, she cannot raise a Section 1981 claim based on the course of dealings between Cousins and Arnold. *See Lane v. Ogden Entm't, Inc.*, 13 F.Supp.2d 1261 (M.D.Ala. 1998) (noting that if plaintiff has no contract, he has no Section 1981 claim which applies solely to contracts); *Dunn v. Uniroyal Chem. Co., Inc.*, 192 F.Supp.2d 557, 561 (M.D.La.2001) (dismissing plaintiff's Section 1981 claim because plaintiff had no contract with defendant). Yet, the evidence indicates that defendant Cousins made it clear to Arnold that the termination was precipitated by plaintiff's continuing status as the operator of the stand. An indirect effort to control the identity of the operator could implicate Section 1981 if a racially discriminatory motive triggered that decision. For example, if defendant had told Arnold that it would terminate him unless he hired a white operator, a court would presumably determine that this action implicated the incumbent black operator's ability to contract with Arnold and that a Section 1981 claim would hence be viable.

Ultimately, however, plaintiff cannot make a *prima facie* case because she was

replaced by another black shoeshine stand operator, who was later replaced by a third black operator. In an employment termination context, one prong of the *McDonnell Douglas* test requires a showing that the plaintiff has been replaced by a comparator of a different race. Here, as plaintiff was replaced by another black operator, she cannot make a *prima facie* case. In other words, whatever motivated Cousins to terminate plaintiff, it is clear that race was not one of those reasons.

### B. *Retaliation Claims As A Result of Termination of Shoeshine Stand*

 Plaintiff also appears to argue that the termination of the shoeshine stand arrangement with Arnold constitutes retaliation in violation of Section 1981. While one might reasonably infer that defendant terminated the stand because it was angry with plaintiff as a result of the whole bazaar imbroglio, that conclusion does not necessarily imply that defendant's conduct violated Section 1981. To answer this question, again, one must consult the appropriate analytic framework for evaluating Section 1981 retaliation claims. If there are few Section 1981 cases claiming harassment in connection with an non-employment contractual relationship, there are even fewer cases dealing with the question of retaliation outside the employment context, under Section 1981. The Eleventh Circuit has recently had one such case arise: *Webster v. Fulton County*, 283 F.3d 1254 (11th Cir.2002). There, an independent contractor had sued the county for following a custom of disparate-treatment racial discrimination in connection with its bid process. After filing this suit, the contractor submitted the lowest bid on several county contracts, but was never awarded the contract. Accordingly, the contractor amended his complaint to add a count charging retaliation, under Section 1981. Noting that the court had previously recognized a viable Section 1981 claim when a defendant's retaliatory acts had allegedly been triggered by the plaintiff's filing of a race-based claim with the EEOC, the Eleventh Circuit held that likewise a Section 1981 retaliation claim could arise when a similar allegation is made after a plaintiff has filed a race-based Section 1981 claim in federal district court. 283 F.3d at 1257 n. 6. The earlier case to which the panel referred, *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405 (11th Cir.1998), arose, however, out of an employment context: that is, the termination of an employee after she had filed a race-based EEOC claim.

The emphasis by the panels in *Webster* and *Andrews* on the filing of a lawsuit and an EEOC complaint, respectively, arises out of an awareness that in employment cases under Title VII or Section 1981, a plaintiff can make a claim for retaliation only if the latter was done in response to "protected conduct." *See, e.g., Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir.1999). The filing of a Section 1981 lawsuit or a race-based EEOC claim would constitute protected conduct. Here, however, plaintiff had neither filed an EEOC complaint nor a Section 1981 lawsuit prior to defendant's effective termination of her as operator of the shoeshine stand. Accordingly, while plaintiff might be able to persuasively argue that defendant's termination of her as the shoeshine stand operator was a petty, mean-spirited, and disproportionate reaction to the conflict that had arisen between plaintiff and defendant regarding the holiday bazaar,[28]

---

28. As the Court assumes that it was this termination that largely prompted plaintiff to file this litigation, not the less consequential, albeit annoying, conduct by defendants prior to

the bazaar, defendant Cousins' decision to terminate the shoeshine stand arrangement has triggered large legal expenses for it and Marriott.

she cannot state a retaliation claim under Section 1981, as a result of this conduct.

## V. *Plaintiff's Claim under 42 U.S.C. § 2000a*

■ Plaintiff's next claim is asserted under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a ("Title II") for racial discrimination in the denial of a public accommodation. The same burden shifting analysis used in the employment context under *McDonnell Douglas* is also applied to claims under Title II. *See Hornick v. Noyes,* 708 F.2d 321, 325 n. 8 (7th Cir.1983); *Laroche v. Denny's, Inc.,* 62 F.Supp.2d 1375, 1382 (S.D.Fla.1999). In order to establish a claim under Title II, the plaintiff must show that she (1) is a member of a protected class; (2) attempted to contract for services and afford herself the full benefits and enjoyment of a public accommodation; (3) was denied the full benefits or enjoyments of a public accommodation; and (4) such services were available to similarly situated persons outside her protected class who received full benefits or who were treated better. *See Laroche,* 62 F.Supp.2d at 1382 (citing *United States v. Lansdowne Swim Club,* 894 F.2d 83, 88 (3rd Cir.1990)).

The parties have presented substantially the same arguments regarding the plaintiff's claim under Title II that they presented regarding her claim under Section 1981. For the reasons discussed above, the Court concludes that plaintiff has failed to present sufficient evidence to create a genuine issue of material fact over whether the defendants acted together to deny the plaintiff the full benefits of a public accommodation. Accordingly, the defendants are entitled to summary judgment on that claim.

## VI. *Plaintiff's Section 1985 Claim*

Plaintiff's next claim is asserted under 42 U.S.C. § 1985(3) ("Section 1985"). Section 1985 provides, in relevant part:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; *in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.*

42 U.S.C. § 1985(3) (emphasis added).

■ The elements of a cause of action under section 1985(3) are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a per-

son is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627–628 (11th Cir.1992) (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)); *see also Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir.1997). The second element requires a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Lucero*, 954 F.2d at 628 (quoting *Scott*, 463 U.S. at 829, 103 S.Ct. 3352).

■ Defendants argue that the plaintiff's claim fails because she has failed to produce sufficient evidence that the defendants had an agreement to deprive the plaintiff of any right or privilege of a citizen of the United States, nor has she produced sufficient evidence that the defendants were acting with a discriminatory animus. The Court concludes that the plaintiff's claim fails because she has failed to establish that the defendants deprived her of "any right or privilege of a citizen of the United States," as that is defined under Section 1985. *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 806 (3rd Cir. 2001) (Section 1985 claim may not be based on the allegation that a plaintiff's private contract rights under Section 1981 were violated); *see also Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 379, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (Section 1985 prohibits only those conspiracies to violate a citizen's fundamental rights derived from the Constitution, not statutory rights) (Powell, J., concurring).

Plaintiff has asserted her claim under Section 1985 based on the same allegations underlying her Section 1981 claim: that the defendants violated her right to enter into a contract to rent a room at the Plaza conference facilities and to enjoy the full benefits of such a contract. She alleges that the defendants violated Section 1985 because they formed a "conspiracy" to deprive her of her right to enter into such a contract. Thus, in order for her claim to be viable under Section 1985, the plaintiff must establish that her right to enter a contract to rent a conference room at the Plaza, and to enjoy the full benefits, terms, conditions and privileges of such a contract, is considered a "right or privilege of a citizen of the United States," as that term has been defined and applied in claims asserted under Section 1985. Although she argues that her "civil rights" were violated by the defendants' actions, she has not established that the right to enter into a purely private contract is the type of "right or privilege" that is protected by Section 1985.

The Supreme Court has made it clear that Section 1985 does not itself *create* any substantive rights; rather, it serves only as a vehicle for vindicating specific federal rights and privileges which have been defined elsewhere. *Novotny*, 442 U.S. at 376, 99 S.Ct. 2345; *see also Brown*, 250 F.3d at 805. Moreover, Section 1985 is not intended to be used as a "general federal tort law," and, in order to prevent such use, courts have been careful to limit causes of action brought under Section 1985 to only those conspiracies that seek to deprive persons of constitutionally protected rights, privileges and immunities "that are protected against private, as well as official encroachment." *Libertad v. Welch*, 53 F.3d 428, 446–50 (1st Cir.1995); *see also Brown*, 250 F.3d at 805.

In the context of actions brought against purely private actors, such as in the instant action, the Supreme Court has thus far recognized only two rights protected against interference under Section 1985(3): the right to be free from involuntary servi-

tude and the right to interstate travel. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 278, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *Caswell v. Morning Call, Inc.,* No. Civ. A. 95–7081, 1996 WL 560355, at *6 (E.D.Pa. Sept. 30, 1996); *Welch v. Bd. of Dirs. of Wildwood Golf Club,* 877 F.Supp. 955, 959 (W.D.Pa.1995). As the Third Circuit stated in 2001:

> The great weight of precedential authority, however, supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action. *See, e.g., Sanders v. Prentice–Hall Corp.,* 178 F.3d 1296 (Table), 1999 WL 115517, at *2 (6th Cir.1999); *Libertad v. Welch,* 53 F.3d 428, 447 n. 15 (1st Cir.1995); *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir.1993).

*Brown,* 250 F.3d at 806.

Furthermore, although the Supreme Court has not held squarely that Section 1985 claims can not be based on an allegation of a conspiracy by private actors to deprive a person of her right to enter a private contract, the Court has held that Section 1985 claims cannot be based on a conspiracy by private actors to discriminate against a person in the employment context, in violation of Title VII of the Civil Rights Act of 1964. *Novotny,* 442 U.S. at 376–378, 99 S.Ct. 2345. Although the Court limited its ruling specifically to claims for employment discrimination brought under Title VII and no other federal statute, two Justices stated in their concurring opinions that Section 1985 was intended only to prohibit conspiracies to deprive a person of fundamental *constitutional* rights, not rights created by federal statute. *Id.,* 442 at 381, 99 S.Ct. 2345 ("I would take advantage of the present opportunity to make clear that this Civil War Era statute was intended to provide a remedy *only* for conspiracies to violate fundamental rights derived from the Constitution.") (Powell, J., concurring) (emphasis in original); *id.,* 442 at 385, 99 S.Ct. 2345 ("I do not believe that statute was intended to provide a remedy for the violation of statutory rights") (Stevens, J., concurring).

In the instant action, the plaintiff has alleged that the defendants conspired to deprive her of her right to enjoy the full terms and conditions of a private contract with the defendants, a statutory right that is protected under Section 1981. Thus, the Court concludes that the plaintiff has failed to establish that the defendants conspired to deprive her of any fundamental right or privilege under the Constitution, and thus, she has failed to establish a claim under Section 1985(3). Accordingly, the defendants are entitled to summary judgment on that claim.

**VII. *Plaintiff's Section 1986 Claim***

The plaintiff has voluntarily agreed that her claims under 42 U.S.C. § 1986 against all defendants should be dismissed. Accordingly, defendants' motions for summary judgment with respect to plaintiff's claim under 42 U.S.C. § 1986 are **GRANTED.**

**VIII. *Plaintiff's State Law Claims***

In addition to her federal claims, plaintiff has also asserted claims against defendants under Georgia state law for breach of contract, tortious interference with business relations, tortious interference with contractual relations, conspiracy, and intentional infliction of emotional distress. Defendants have moved for summary judgment on all of these claims.

Because all the claims over which the Court had original jurisdiction now have been removed from the case due to the Court's decision to grant defendants' motion for summary judgment with re-

spect to plaintiff's federal claim, § 1367(c)(3) applies. This section provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As the Supreme Court has observed, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (footnote omitted). *See also Hardy v. Birmingham Bd. Of Educ.*, 954 F.2d 1546, 1550 (11th Cir.1992).

The Court concludes that dismissal is appropriate in this case because plaintiff's federal claims have been dismissed. Moreover, "[n]eedless decision of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, the Court **DISMISSES without prejudice** plaintiff's remaining state law claims.

## IX. *Miscellaneous Motions*

Two additional motions are currently pending before the Court. On October 17, 2001, one month before the discovery period expired in this action, plaintiff filed a Motion to Compel [31], seeking an Order from the Court compelling Cousins to disclose certain materials requested by plaintiff. In particular, plaintiff sought information related to Beauchamp's and McCarthy's employment histories and documents related to their employment with Cousins. The Cousins defendants filed their response to plaintiff's motion to compel on November 7, 2001, stating that they had responded to the plaintiff's requests, but plaintiff was refusing to withdraw her motion to compel. Thereafter, on November 16, 2001, plaintiff withdrew portions of her motion to compel, but stated that the defendants were still refusing to respond fully to Interrogatory 16 and to Requests to Produce 13 and 14, which involve the production of the personnel files for Beauchamp and McCarthy. The Court denies as moot this motion.

On November 16, 2001, defendants filed a Motion to Exclude Testimony [47]. Defendants contend that plaintiff violated Federal Rule of Civil Procedure 26 by failing to identify all persons with knowledge relevant to the issues in this action in her Mandatory Disclosures. Defendants have shown that plaintiff initially identified only eight persons as having relevant knowledge in her initial Mandatory Disclosures filed on November 2, 2000, but one year later, on November 2, 2001, just two weeks before the close of the discovery period, plaintiff filed a supplement to her Mandatory Disclosures identifying thirty-two persons not previously identified to defendants. The Court denies as moot this motion.

## CONCLUSION

For the foregoing reasons, plaintiff's Motion to Compel [31] is **DENIED as MOOT**; defendants' Motion to Exclude Testimony [47] is **DENIED as MOOT**;

defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [57] is **GRANTED**; defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [56] is **GRANTED**; plaintiff's Motion to Supplement her Responses to defendants' Motions for Summary Judgment [71] is **GRANTED**; plaintiff's Motion to Supplement her Response to defendants' Statements of Material Facts [75] is **GRANTED**; plaintiff's Motion for Leave to File a Sur–Reply to defendants Cousins Properties, Inc.'s, Jeff McCarthy's, and Linda Beauchamp's Motion for Summary Judgment [84] is **DENIED**; plaintiff's Motion for Leave to File a Sur–Reply to defendants Sodexho, Inc.'s and Tracy Baker's Motion for Summary Judgment [87] is **DENIED**; and plaintiff's Motion for Leave to Supplement her Sur–Reply to all defendants' Motions for Summary Judgment [88] is **DENIED**. All motions filed by the parties requesting leave from the Court to file briefs exceeding the page limitations of the Local Rules [54][55][68][80] are **GRANTED**.

The Clerk shall close this action.